USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BYRON RANDALL FISHER,

                Plaintiff,

v.

RICHMOND, THE AMERICAN
INTERNATIONAL UNIVERSITY IN
LONDON, INC.,

                Defendant.

No. 17-CV-752 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Byron Randall Fisher, proceeding *pro se*, brings this breach of contract action against Defendant Richmond, The American International University in London, Inc. for its failure to grant him a Master of Arts degree. Richmond now moves for dismissal, or in the alternative, summary judgment. For the reasons set forth below, Richmond's motion to dismiss is denied but its motion for summary judgment is granted.

## BACKGROUND[1]

Richmond is a Delaware Corporation with a principal place of business in the United Kingdom. Def. 56.1 ¶ 2. Fisher is a resident of New York who matriculated at Richmond on the fall of 2010 in order to study international relations. Def. 56.1 ¶ 3.

Richmond made available to Fisher the University Catalogue for that academic year, which contained a variety of rules, regulations, and guidelines for students. Def. 56.1 ¶ 4. According to

---

[1] These facts are largely drawn from the parties' submissions in connection with the instant motion for summary judgment, including the Rule 56.1 Statements submitted by Richmond ("Def. 56.1") and Fisher ("Pl. 56.1") and Richmond's Counterstatement ("Def. Count. 56.1"). Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied only by way of conclusory statement without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)-(d).

the Handbook for the International Relations program, a student is in good academic standing and can continue in the program only if he maintains a cumulative GPA above 3.0. Def. 56.1 ¶ 5. Students must pass all aspects of their courses and may not graduate until all components of their program, including a written thesis, have been successfully completed. Def. 56.1 ¶ 7.

Each student's thesis is graded by an Assessment Board, which consists of, *inter alia*, a Chairman, Secretary, Departmental Chair, and External Examiner. Def. 56.1 ¶¶ 8-9. Decisions made by the Board are final. Def. 56.1 ¶ 10. If a student is dissatisfied with any aspect of his academic experience, he is free to meet with an academic adviser. Def. 56.1 ¶ 11. He may also file a formal complaint with the Provost if the dissatisfaction relates to a grade. Def. 56.1 ¶ 12.

A few weeks prior to the due date for Fisher's thesis, he sent a draft to Dr. Boys, his academic adviser, for a preliminary review. Def. 56.1 ¶¶ 13-14. Dr. Boys informed Fisher in writing that he would likely receive a C unless certain changes were made. Def. 56.1 ¶ 15. Fisher did not revise the draft as recommended. Def. 56.1 ¶ 16. Fisher ultimately received a C minus. Def. 56.1 ¶ 17. The Thesis Mark Sheet contains extensive negative comments about Fisher's work, including that the "degree of research reveals much that is lacking in the paper" and that Fisher's efforts to interview four individuals for research lacked "follow up questions, interpretation or analysis, resulting in [Fisher] acting as stenographer only." Feldman Aff. Ex. F, at 2, ECF No. 48-6. Richmond had another examiner review the thesis, who similarly assigned Fisher a C minus. Def. 56.1 ¶ 18.

In November of 2011, the Assessment Board convened to assess all of the potential graduates, reviewed Fisher's thesis, and confirmed that the grade of C minus would not be changed. Def. 56.1 ¶ 19. A day before the Board was to meet, Fisher wrote the President of Richmond seeking a change of his grade and enclosing a copy of his thesis. Def. 56.1 ¶¶ 20-21.

In his correspondence, Fisher noted that the C minus grade would prevent him from receiving a Master of Arts degree. Feldman Aff. Ex. G, at 2, ECF No. 48-7. Though Fisher stated that the grade was "grossly unfair," he did not include any further explanation. Feldman Aff. Ex. G. at 2. The Provost responded by way of email on January 4, 2012, advising Fisher that his letter did not constitute a formal petition, which he had the right to submit to the Board.[2] Def. 56.1 ¶ 22.

Fisher was afforded an opportunity by the Richmond Department of International Relations to submit a revised thesis in twelve months, which he declined to do. Def. 56.1 ¶ 26. Instead, he filed complaints with the U.S. Department of Veterans Affairs and the Delaware Department of Education, neither of which resulted in him receiving relief. Fisher Dep. Tr. 85:19-86:4, 110:6-11, ECF No. 48-1. Pursuant to the terms of the Handbook for students who fail to submit a thesis that receives a passing grade, Richmond awarded Fisher a Post Graduate Certificate as an exit award in 2014. *Compare* Feldman Aff., Ex. C, at 14, ECF No. 48-3 *with* Ex. N, at 2, ECF No. 48-14.

That February, Fisher was sent a form email from the Richmond registrar stating that he had "fulfilled the requirements for the award of [his] Richmond degree," and that the only impediment to receiving his diploma would be any outstanding financial obligations. Def. 56.1 ¶ 23; Feldman Aff. Ex. I, at 2, ECF No. 48-9. Later that day, Fisher was sent another email from the registrar containing the same message, as well as an additional paragraph noting that "all grades are issued subject to confirmation at the Open University examination boards" and that the examination boards would meet late in the summer to decide Fisher's degree classification. Def. 56.1 ¶ 24; Feldman Aff. Ex. J, at 2, ECF No. 48-10. In January of 2015, Richmond sent Fisher another email stating that he had not been awarded a Master's degree. Def. 56.1 ¶ 25.

---

[2] Richmond mistakenly asserts that this email correspondence to Fisher was sent by the University President. *Compare* 56.1 ¶ 22 *with* Feldman Aff. Ex. H, at 2, ECF No. 48-8.

3

## PROCEDURAL HISTORY

Fisher filed a Complaint commencing this action on January 27, 2017. ECF No. 2. After the parties completed discovery, Richmond filed the instant motion to dismiss for lack of subject matter jurisdiction and for summary judgment. ECF No. 46. The Court held oral argument on August 17, 2018.

## STANDARD OF REVIEW

A district court should dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) when it lacks the statutory or constitutional authority to adjudicate it. *See Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011). The court should take all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor, but the plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations omitted). The Court may also consider evidence outside of the pleadings. *Id.*

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d. Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

If the moving party satisfied its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citations and alteration omitted).

When a plaintiff proceeds *pro se*, "[t]he court must liberally construe pleadings and briefs submitted[,] . . . reading such submissions to raise the strongest arguments they suggest." *Pudlin v. Office for (Not of) Civil Rights of the U.S. Dep't of Educ.*, 186 F. Supp. 3d 288, 292 (S.D.N.Y. 2016) (citation omitted). But while the court must draw the most favorable inferences that a *pro se* plaintiff's pleadings support, it cannot invent factual allegations that the plaintiff has not pled. *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

## DISCUSSION

### I. Subject Matter Jurisdiction

As an initial matter, Richmond asserts that the complaint should be dismissed because Fisher's claims, in effect, challenge the University's decision to deny him a Master of Arts degree—an academic decision that it argues is reviewable only in a C.P.L.R. Article 78 proceeding in state court. It is true that a university that is chartered or incorporated in New York is subject to C.P.L.R. Article 78. *Altschuler v. Univ. of Pa. Law Sch.*, No. 95-CV-249 (LLC), 1997 WL 129394, at *4 (S.D.N.Y. Mar. 21, 1997). But this action is brought against a university with its principal place of business in Delaware concerning events that occurred on its main campus in London. Richmond has not alleged or presented any evidence tending to show that it is chartered

5

or incorporated in New York. Nor has Richmond supplied—or has the Court located—any case law in support of the proposition that universities not incorporated or charted in New York may be subject to Article 78 proceedings. *Cf. id.* As such, the Court rejects this argument. *See id.*

## II. Breach of Contract

Fisher asserts, under four different theories, that Richmond committed a breach of contract when it refused to award him a Master's Degree. Before the Court addresses these claims, however, it must first determine which jurisdiction's law to apply. *See Altschuler*, 1997 WL 129394, at *4. It is well-settled that a federal court sitting in diversity jurisdiction must apply the choice of law rules of the forum state. *See In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262 (NRB), 2015 WL 4634541, at *108 (S.D.N.Y. Aug. 4, 2015). Accordingly, the Court applies New York choice-of-law rules.

"In contract cases, New York courts now apply a 'center of gravity' or 'grouping of contacts' approach. Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1030–31 (2d Cir. 1996) (citation omitted). However when this analysis suggests that foreign law should apply, but the parties have failed to speak to the applicability of said law, the Court may decline to investigate the issue *sua sponte*. *See Gold-Flex Elastic Ltd. v. Exquisite Form Indus., Inc.*, No. 95-CV-3881 (LMM), 1995 WL 764191, at *3 (S.D.N.Y. Dec. 28, 1995). Indeed, "[u]nder New York law, the parties' failure to plead and prove [the content of] applicable foreign law permits the court to proceed on the assumption that the law of the foreign jurisdiction accords with that of New York on the subject." *Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 383 (S.D.N.Y. 2000).

Here, although there are substantial contacts in the United Kingdom, the Court elects to apply New York law because in their briefing the parties neglected to address the applicability of UK law and at oral argument they consented to the application of New York law. *See Tri-State Emp't Servs., Inc. v. Mountbatten Sur. Co., Inc.*, 295 F.3d 256, 262 (2d Cir. 2002) (collecting cases); *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 281 n.4 (E.D.N.Y. 2009); *Dar El-Bina*, 79 F. Supp. 2d at 383 ("Under New York law, the parties' failure to plead and prove [the content of] applicable foreign law permits the court to proceed on the assumption that the law of the foreign jurisdiction accords with that of New York on the subject."); *Creative Resources, Inc. v. Rumbellow*, 664 N.Y.S.2d 86, 86-87 (2d Dep't 1997). Under New York law, a valid contract is formed only when there is an offer, acceptance, consideration, mutual assent, and an intent to be bound. *Alkholi v. Macklowe*, No. 17-CV-16 (DAB), 2017 WL 6804076, at *6 (S.D.N.Y. Dec. 22, 2017) (citation omitted). "The fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and if there is no meeting of the minds on all essential terms, there can be no contract, written or oral." *In re SinoHub, Inc. Sec. Litig.*, No. 12-CV-8478 (WHP), 2015 WL 3792625, at *1 (S.D.N.Y. June 3, 2015).

When a student is admitted to a university, an implied contract arises between him and the university. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011). "The terms of the implied contract are supplied by the [school's] bulletins, circulars and regulations made available to the student." *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04-CV-704 (RPP), 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005) (alteration in original) (citation omitted). To make a valid breach of contract claim, however, a student must identify a specific promise or obligation that the university breached or failed to meet, and cannot simply rely on broad, non-specific allegations that the university violated its policies and procedures. *See*

*id.*, at *10–11. When a breach of contract claim is brought by a student against a university, its judicial review is limited to determining whether the university abided by its own rules and whether it has acted in bad faith, arbitrarily, or capriciously. *See Rodriguez v. N.Y. Univ.*, No. 05-CV-7374 (JSR), 2007 WL 117775, at *4 (S.D.N.Y. Jan. 16, 2007). A university's decisions are typically afforded great deference, and "are rarely found to be arbitrary." *Keles v. N.Y. Univ.*, No. 91-CV-7457 (SWK), 1994 WL 119525, at *6 (S.D.N.Y. Apr. 6, 1994), *aff'd*, 54 F.3d 766 (2d Cir. 1995).

### A. Richmond's Thesis Grading Criteria

Fisher first asserts that Richmond committed a breach of contract because he complied with the only definitive grading criterion set forth in the Handbook for receiving a passing grade. Specifically, the Handbook states that students who "wish to gain grades in the 'A' range . . . should also conduct some original research," Feldman Aff., Ex. C at 20, which Fisher claims to have satisfied by virtue of conducting four interviews.

Even assuming, *arguendo*, that this statement in the Handbook constituted a term of the implied contract between Fisher and Richmond, no reasonable jury could conclude that Richmond failed to adhere to this promise or that it acted in bad faith, arbitrarily, or irrationally. Fisher fundamentally miscomprehends the statement at issue. While the Handbook provides that students wishing to receive a grade of A should conduct some original research, its language does not dictate that conducting some original research is, in itself, enough to earn a student such a grade. Indeed, original research was *necessary* to receive an A, but was by no means *sufficient*. Thus, even if Fisher did conduct some original research in support of his thesis, it does not follow that Richmond breached any purported contact by awarding him a C minus.

Further, no reasonable jury could find that Richmond's decision was made in bad faith, arbitrarily, or capriciously. The commentary on Fisher's Thesis Mark Sheet states that his "degree

8

of research reveals much that is lacking," and that the original research that he conducted lacked follow-up, interpretation, and analysis. Feldman Aff. Ex. F, at 2. This evaluation of Fisher's original research must be afforded great deference. *See Keles*, 1994 WL 119525, at *6.[3]

### B. Fisher's Appeal Attempt

Fisher next asserts that Richmond committed a breach of contract by not recognizing his attempt to appeal his thesis grade to the University's President. In support of this claim, Fisher relies on the Handbook's statement that complaints must be filed with the Associate Dean of Student Affairs, and the fact that when he sought to make a complaint, the University did not have an Associate Dean of Student Affairs. In construing the Complaint liberally, Fisher appears to argue that Richmond breached its obligation to have a specific mechanism in place for the University to resolve complaints raised by students. This argument is unavailing.

While it is undisputed that Richmond did not have an Associate Dean of Student Affairs at the time Fisher submitted his complaint, he presents no facts to suggest that the University breached its implied contract with him. Notably, the record reveals that Richmond failed to recognize Fisher's appeal because he did not comply with the formal procedure by failing to provide an explanation as to why his grade was inappropriate. *Compare* Feldman Aff. Ex. G, at 2 *with* Exs. C at 17, H. Indeed, despite not having an Associate Dean of Student Affairs, Richmond took steps to ensure that Fisher had ample time to pursue the formal process and the ability to submit a proper complaint to the Dean of Academic Affairs—the same individual to whom the Handbook dictates the Associate Dean of Student Affairs should refer formal complaints. *See*

---

[3] Fisher also asserts that the Handbook was a document previously used by Richmond with respect to the school's art history program and therefore it was "plagiarized." The import of this argument, in Fisher's view, appears to be that if the requirements that apply to art history but not international relations are removed from consideration, there is only one criterion for receiving a passing grade—conducting original research—which he fulfilled. As the Court has explained, however, the Handbook clearly indicated that fulfillment of the original research requirement was necessary, but not sufficient, to receive such a grade.

Feldman Aff. Exs. C at 17, H. Fisher has presented no facts to the contrary, and thus has failed to demonstrate that there exists a genuine issue of fact necessitating a trial.

### C. Fisher's Post Graduate Certificate

Fisher further asserts that Richmond committed a breach of contract by waiting until 2014 to award him a Post Graduate Certificate, rather than awarding it to him in 2011 when he received his failing grade. Fisher specifically relies on the Handbook's statement that "A Post Graduate Certificate/Post Graduate Diploma will be awarded as an exit award to students who fail or do not submit the thesis but maintain a cumulative GPA of 3.0/B in coursework, in recognition of their achievement in this area." *See* Feldman Aff. Ex. C, at 14. This claim is no more successful than Fisher's first two arguments.

Although the Handbook states that students who do not receive a passing grade on their thesis will be awarded a Post Graduate Certificate, it makes no promise as to the promptness of that award. Further, Fisher has presented no facts to demonstrate that there is a genuine issue as to whether Richmond acted in bad faith, arbitrarily, or capriciously when it waited until after Fisher's complaints that were pending with the University, the U.S. Department of Veterans Affairs, and the Delaware Department of Education were resolved to award him the Post Graduate Certificate. Thus, no issue remains for trial.

### D. Richmond's Emails

Fisher finally asserts that a valid contract was formed when Richmond informed him by email that he had successfully completed his degree requirements, with the only impediment to his degree being any outstanding financial obligations. Fisher further relies on an official transcript that was delivered to him several weeks later stating that he had been awarded a Master of Arts degree.

10

This argument also fails. First, the terms of any contract that existed between Fisher and Richmond upon his enrollment was governed by the university's own regulations and policies, such as the Handbook. *See Radin*, 2005 WL 1214281, at *10. The terms of these documents explicitly contradict the erroneous email message and transcript that were inadvertently sent to Fisher. Indeed, Fisher, in complaining about his grade, even explicitly acknowledged that a C minus would prevent him from receiving a Master's degree. *See id.* Ex. G. Second, these documents could not form an independent contract because they did not constitute an offer from the university, Fisher did not accept their terms, and there was no consideration. Nor, for the same reasons, could these documents constitute a modification of the original contract. *See Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (2d Dep't 1980) ("Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms.").

Ultimately, even if the email and transcript appeared to be contractual obligations at first blush, it would run counter to the established policy of judicial restraint in interference with academic matters to find these communications binding upon Richmond. It has long been recognized that "[w]hen an educational institution issues a diploma to one of its students, it is, in effect, certifying to society that the student possesses all of the knowledge and skills that are required by his chosen discipline." *See Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413 (1980). As such, this Court declines to now allow Fisher to acquire a diploma by requiring Richmond to alter Fisher's thesis grade, confer a degree, or award any incidental monetary relief where the University has determined that Fisher failed to comply with the university's degree requirements.[4]

---

[4] Fisher separately asserts that, in connection with the instant motion, Richmond submitted an "altered" version of his transcript—one indicating that he was only awarded a Post Graduate Certificate with no reference to his Master of Arts degree. The import of this argument on the merits of the pending motion is unclear. To the extent Fisher seeks sanctions against opposing counsel or some other form of relief, the Court declines to take such action. Although

11

## CONCLUSION

The Court is mindful of Fisher's *pro se* status, and has read his pleadings and submissions liberally to raise the strongest arguments. Nevertheless, no genuine issues of material fact exist. Accordingly, Richmond's motion is granted. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries thirty-seven, thirty-eight, forty-one, and forty-six and to close the case.

SO ORDERED.

Dated: August 20, 2018
New York, NY

Ronnie Abrams
United States District Judge

---

Fisher has supplied a transcript printed in January 2014, *see* Pl. Letter at 3, ECF No. 49, Richmond submitted one printed in 2016, after the decision not to award Fisher a master's degree was made, *see* Feldman Aff. Ex. K, at 4, ECF No. 48-11. There is thus no basis to conclude that counsel for Richmond has acted in bad faith.